JASON R. HULL [11202]
JHULL@MOHTRIAL.COM
TREVOR C. LANG [14232]
TLANG@MOHTRIAL.COM
**MARSHALL OLSON & HULL, PC**
NEWHOUSE BUILDING
TEN EXCHANGE PLACE, SUITE 350
SALT LAKE CITY, UTAH 84111
TELEPHONE: 801.456.7655

COUNSEL FOR PLAINTIFF AND
PROPOSED CLASS COUNSEL

JEFFREY KALIEL [PRO HAC VICE FORTHCOMING]
JKALIEL@KALIELPLLC.COM
SOPHIA GOLD [PRO HAC VICE FORTHCOMING]
SGOLD@KALIELPLLC.COM
**KALIEL, PLLC**
1875 CONNECTICUT AVENUE NW, 10TH FLOOR
WASHINGTON, DC 20009
TELEPHONE: 202.250.4783

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JANE THORNTON, an individual on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>ZIONS BANCORPORATION, N.A.,<br><br>     Defendant. | **COMPLAINT**<br><br>**[PROPOSED CLASS ACTION]**<br><br>JURY TRIAL DEMANDED<br><br>Case No.:_____<br><br>Judge:_____ |

## CLASS ACTION COMPLAINT

Plaintiff Jane Thornton, on behalf of herself and all persons similarly situated, brings this class action complaint against Zions Bancorporation, N.A. ("Zions", the "Bank" or "Defendant") and alleges the following:

## INTRODUCTION

1.     Plaintiff brings this action individually and on behalf of all similarly situated consumers against Defendant Zions Bancorporation, N.A. ("Zions or "Bank"), to include all of its local brands in the various states where it does business.  Zions operates via eight customer-facing

brands which often differ by state. This case challenges Zions' routine practices of (a) assessing more than one insufficient funds fee ("NSF Fee") on the same transaction; and (b) assessing an Overdraft Fee ("OD Fee") on transactions that did not actually overdraw checking accounts.

2.     Zions' customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation of Zions' clear contractual commitments.

3.     Plaintiff, on behalf of herself and two Classes of similarly situated consumers, seeks to end Zions' abusive and predatory practices and force it to refund all of these improper charges. Plaintiff asserts a claim for breach of contract, including breach of the covenant of good faith and fair dealing, and seeks damages, restitution, and injunctive relief, as set forth more fully below.

4.     While there is nothing unlawful about assessing OD Fees on accounts when such fees are assessed in compliance with contractual terms, OD Fees in general have a crushing impact on persons living paycheck to paycheck. This is why the financial services industry is increasingly moving away from such fees.

5.     For example, one of the nation's largest consumer banks, Ally Bank recently stopped assessing overdraft fees altogether. Diane Morais, Ally Bank's president of consumer and commercial banking, said that one reason is because OD Fees disproportionately affect people who are living paycheck to paycheck and that OD Fees disproportionately affect Black and Latino households. *Overdraft Fees Are Getting the Boot at Ally Financial*, The Wall Street Journal (June 2, 2021), https://www.wsj.com/articles/overdraft-fees-are-getting-the-boot-at-ally-financial-11622631600 (last accessed June 4, 2021).

6.      Indeed, Black households and those with low-to-moderate incomes are almost twice as likely to incur OD Fees as white households or those with higher incomes, according to a report from the Financial Health Network, a research firm partly funded by financial institutions.

### PARTIES

7.      Plaintiff is a citizen and resident of Salt Lake City, Utah.

8.      Defendant Zions is a bank holding company headquartered in Salt Lake City, Utah. Zions is the largest bank in Utah with total assets exceeding $75 billion. Zions operates as a national bank doing business under eight local brands: AmegyBank, California Bank & Trust, The Commerce Bank of Oregon, The Commerce Bank of Washington, National Bank of Arizona, Nevada State Bank, VectraBank Colorado, and Zions Bank. The Bank operates in 11 western states: Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Texas, Utah, Washington, and Wyoming. Zions has approximately 428 branch offices throughout the western states. The Bank is publicly traded and has a market capitalization of nearly $10 billion.

### JURISDICTION AND VENUE

9.      This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed class resides outside of Utah; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Zions is subject to personal jurisdiction here and regularly conducts business in this District, and because

a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

**I.     ZIONS CHARGES MORE THAN ONE FEE ON THE SAME TRANSACTION**

11.     Zions' Deposit Account Agreement ("Deposit Agreement"), attached as Exhibit A hereto, and Personal Accounts Schedule of Fees ("Fee Schedule"), attached as Exhibit B hereto (collectively, "Account Documents"), allow Zions to charge a *single* $35 NSF Fee or a *single* $35 OD Fee when a transaction is returned for insufficient funds or paid despite insufficient funds.

12.     Even though Zions operates through eight brands across 11 states, the Bank utilizes a singular Deposit Agreement that is applicable to all of its brands, and Fee Schedules with substantially similar language across all of its brands.  *See* Exhibits A & B.  Certain contractual provisions only apply in certain states, but the terms relevant to this case are the same for all Zions customers.

13.     Zions breaches its Account Documents by charging more than one $35 NSF Fee and/or OD Fee on the same transaction, since the contract explicitly states—and reasonable consumers understand—that the same transaction can only incur a single NSF or OD Fee.

14.     Zions' abusive practices are not standard within the financial services industry. Indeed, major banks like JP Morgan Chase—the largest consumer bank in the country—charge one NSF Fee per item, even if that item is resubmitted for payment multiple times.[1] And while

---

[1] As indicated by Chase's printed disclosures, an "item" maintains its integrity even if multiple processes are affected on it: "If we return the same item multiple times, we will only charge you one Returned Item Fee for that item within a 30-day period."

some other banks engage in the same practices as Zions, their members agree to terms authorizing the fee practice.

15.     Zions' Account Documents do not say that Zions may repeatedly charge customers multiple fees on a single transaction. To the contrary, the Account Documents indicate Zions will only charge a single NSF Fee or OD Fee on a transaction.

**A.     Plaintiff's Experiences.**

16.     In support of her claim, Plaintiff offers examples of fees that should not have been assessed against her checking account. As alleged below, Zions: (a) reprocessed previously declined transactions; and (b) charged an additional fee upon reprocessing.

17.     For example, on numerous occasions in April 2020, Plaintiff was charged $35 NSF Fees on transactions which were resubmitted by the merchant for payment without Plaintiff's request to reprocess the transactions. The re-submitted transactions were specifically labeled as "RETRY PYMTs" on her statements.

18.     Each merchant request for payment was for a single transaction and, as is laid out in Zions' Account Documents, should be subject to, at most, a single NSF Fee (if Zions returned it) or a single OD Fee (if Zions paid it).

**B.     The Imposition of Multiple Fees on a Single Transaction Violates Zions' Express Promises and Representations.**

19.     Zions' Account Documents state that the Bank will assess a single fee of $35 for a transaction that is returned due to insufficient funds.

20.     According to the Fee Schedule, at most a *single* fee will be assessed "per check" or "per ACH" when a "transaction" is returned or paid into overdraft:

Insufficient Funds (NSF) Fee          **$35.00**

- Per check, ACH, or wire transaction posted against insufficient funds, whether the bank pays or returns the transaction.
- Per ATM or one-time debit transaction paid against insufficient funds if you have opted-in to our Debit Card Overdraft Service.
- Per multiple-use debit card transaction paid against insufficient funds.
- Per non-debit card withdrawal transaction paid against insufficient funds.

Fee Schedule, Ex. B, p. 1.

21.     The same check, ACH, or other electronic payment on an account is not a new "transaction" each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit the transaction.

22.     Indeed, the example provided by Zions itself does not allow for Zions to reprocess a single transaction and charge multiple NSF Fees. Even if Zions reprocesses an instruction for payment, it is still the same transaction. The Bank's reprocessing is simply another attempt to effectuate an accountholder's original order or instruction.

23.     As alleged herein, Plaintiff took only a single action to make a single payment; she therefore created only one transaction and may be charged only a single fee.

24.     As the disclosures described above show, Plaintiff never agreed that Zions may assess multiple NSF Fees for a transaction that was returned for insufficient funds and later reprocessed one or more times and returned again.

25.     In sum, Zions promises that one $35 NSF Fee or one $35 OD Fee will be assessed per item, and this must mean all iterations of the same instruction for payment. As such, Zions breached the contract when it charged more than one fee per transaction.

26.     A reasonable consumer would understand that Zions' Account Documents permit it to assess an NSF Fee only once per "transaction."

27.     Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same transaction will be treated as the same "transaction," which the Bank will either pay (resulting in an overdraft item) or return (resulting in a returned transaction) when it decides there are insufficient funds in the account. Nowhere do Zions and its customers agree that Zions will treat each reprocessing of a check or ACH payment as a separate transaction, subject to additional fees.

28.     Customers reasonably understand, based on the language of the Account Documents, that the Bank's attempts to reprocess checks or ACH payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger additional NSF Fees. In other words, it is always the same transaction.

29.     Banks like Zions that employ this abusive multiple fee practice know how to plainly and clearly disclose it. Indeed, other banks and credit unions that engage in this abusive practice require their accountholders to expressly authorize it—something Zions never did.

30.     For example, First Hawaiian Bank engages in the same abusive practices as Zions, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

*Terms and Conditions of FHB Online Services*, First Hawaiian Bank 40, https://bit.ly/2KWMvTg (last accessed Jan. 28, 2021) (emphasis added).

31.     Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*Consumer Account Terms and Conditions*, Klein Bank 4 (Jan. 2013), https://bit.ly/2KVCkhI (emphasis added).

32.     Central Pacific Bank, a leading bank in Hawai'i, states in its deposit account under the "MULTIPLE NSF FEES" subsection:

> Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient funds ("NSF") in your account, may be resubmitted one or more times for payment, and a returned item/transaction fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/non-sufficient funds.

*Miscellaneous Fee Schedule*, Central Pacific Bank 1 (Jan. 4. 2021), https://www.cpb.bank/media/2776/fee-001.pdf (last accessed June 4, 2021).

33.     BP Credit Union likewise states: "We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item." *Membership and Account Agreement,* BP Federal Credit Union, ¶ 14(a), https://www.bpfcu.org/images/docs/membership-agreement.pdf (last accessed June 4, 2021).

34.     Regions Bank likewise states:

If an item is presented for payment on your account at a time when there is an insufficient balance of available funds in your account to pay the item in full, you agree to pay us our charge for items drawn against insufficient or unavailable funds, whether or not we pay the item. If any item is presented again after having previously been returned unpaid by us, you agree to pay this charge for each time the item is presented for payment and the balance of available funds in your account is insufficient to pay the item.

*Deposit Agreement*, Regions Bank 18 (2018), https://bit.ly/2L0vx6A (last accessed June 4, 2021).

35.     Andrews Federal Credit Union states:

You understand and agree that a merchant or other entity may make multiple attempts to resubmit a returned item for payment. Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to use for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

*Terms & Conditions*, Andrews Federal Credit Union 17 (Aug. 2020), ¶ 6, https://bit.ly/3iXEdHb (last accessed June 4, 2021).

36.     Consumers Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Member Services Guide*, Consumers Credit Union 5 (Apr. 2020), ¶ 11a, https://bit.ly/3iVM1ta

(last accessed June 4, 2021).

37.     Wright Patt Credit Union states:

Consequently, because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and

represented regardless of the number of times an item is presented or represented to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information*, Wright Patt Credit Union 13 (July 2020), ¶ 6.1, (last accessed June 4, 2021).

38.     Railroad & Industrial Federal Credit Union states:

Consequently, because we may charge an NSF fee for an NSF item each time it is presented, we may charge you more than one NSF fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Important Account Information for Our Members*, Railroad & Industrial Federal Credit Union, p. 2, (Aug. 1, 2019), https://bit.ly/3t5ehhF (last accessed June 4, 2021).

39.     Partners 1st Federal Credit Union states:

Consequently, because we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item. Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

*Consumer Membership & Account Agreement*, Partners 1st Federal Credit Union, p. 11 (Sept. 15, 2019), https://bit.ly/39pDZWb (last accessed March 2, 2021).

40.     Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once** . . . we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment[.]

*Membership and Account Agreement*, Members First Credit Union of Florida 3, https://bit.ly/39rRJ2Y (last accessed March 2, 2021).

41.     Community Bank, N.A. states:

We cannot dictate whether or not (or how many times) a merchant will submit a previously presented item. You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned.

*Overdraft and Unavailable Funds Practices Disclosure*, Community Bank 5 (Nov. 12, 2019), https://bit.ly/3iY9dH2 (last accessed June 4, 2021).

42.     RBC Bank states:

We may also charge against the Account an NSF fee for each item returned or rejected, including for multiple returns or rejections of the same item.

*Service Agreement for Personal Accounts*, RBC Bank 13 (Sept. 17, 2014), https://bit.ly/3otUtko (last accessed June 4, 2021).

43.     Diamond Lakes Credit Union states,

Your account may be subject to a fee for each item regardless of whether we pay or return the item. We may charge a fee each time an item is submitted or resubmitted for payment; therefore, you may be assessed more than one fee as a result of a returned item and resubmission(s) of the returned item.

*Membership and Account Agreement*, Diamond Lakes Federal Credit Union, https://bit.ly/39o2P94 (last accessed June 4, 2021).

44.     Parkside Credit Union states,

If the Credit Union returns the item, you will be assessed an NSF Fee. Note that the Credit Union has no control over how many times an intended payee may resubmit the same check or other item to us for payment. In the event the same check or other item is presented for payment on more than one occasion, your account will be subject to an additional charge on each occasion that the item is presented for

payment. There is no limit to the total fees the Credit Union may charge you for overdrawing your account.

*Membership and Account Agreement*, Parkside Credit Union 21 (Jan. 30, 2020), https://bit.ly/3aaXfpG (last accessed March 2, 2021).

45.     Zions provides no such disclosure, and by not doing so, deceives its accountholders.

**C.     The Imposition of Multiple Fees on a Single Transaction Breaches Zions' Duty of Good Faith and Fair Dealing.**

46.     Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are vested with a discretionary power over the other party. This is the law of Utah and nearly all states.  Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has been adopted by all states—mandates good faith and fair dealing. As such, when a party such as Zions gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that the Bank is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the Bank has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

47.     Here—in the adhesion agreements Zions foisted on Plaintiff and its other customers—Zions has provided itself numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, the Bank abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged multiple fees for the same transaction.

48.     Zions exercises its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it defines "transaction" in a way that directly leads to more NSF Fees. Further, Zions abuses the power it has over customers and their bank accounts and acts contrary to their reasonable expectations under the Account Documents. This is a breach of the Bank's implied covenant to engage in fair dealing and act in good faith.

49.     By exercising its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging more than one fee on a single transaction, Zions breaches the reasonable expectation of Plaintiff and other customers and in doing so violates the implied covenant to act in good faith.

50.     It was bad faith and totally outside Plaintiff's reasonable expectations for Zions to use its discretion to assess multiple NSF Fees and/or OD Fees for a single attempted payment.

## II.     DEFENDANT CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

51.     Plaintiff has a checking account with Defendant.

52.     Defendant issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

53.     Pursuant to its Account Documents, Defendant charges fees for transactions that purportedly result in an overdraft.

54.     Plaintiff brings this cause of action challenging Defendant's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

55.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces account holders' checking accounts by the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. Therefore, customers' accounts will always have sufficient available funds to cover these transactions because Defendant has already sequestered these funds for payment.

56.    However, Defendant still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

57.    Despite putting aside sufficient available funds for debit card and other POS transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

58.    Defendant maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

59.    That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to

account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

60.     Still, despite keeping those held funds off-limits for other transactions, Defendant improperly charges OD Fees on those APPSN Transactions, even though the APPSN Transactions *always* have sufficient available funds to be covered.

61.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created

> by the disclosures), the practice of assessing fees under these circumstances was
> found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

62.    There is no justification for these practices, other than to maximize Defendant's
OD Fee revenue. APPSN Transactions only exist because intervening checking account
transactions supposedly reduce an account balance. But Defendant is free to protect its interests
and either reject those intervening transactions or charge OD Fees on those intervening
transactions—and it does the latter to the tune of millions of dollars each year. But Defendant was
not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these
APPSN Transactions.

63.    Besides being unfair and unjust, these practices breach contract promises made in
Defendant's adhesion contracts—contracts which fail to inform accountholders about the true
nature of Defendant's processes and practices. These practices also exploit contractual discretion
to gouge accountholders.

64.    In plain, clear, and simple language, the Account Documents covering OD Fees
promise that Defendant will only charge OD Fees on transactions that have insufficient funds to
cover that transaction.

65.    In short, Defendant is not authorized by contract to charge OD Fees on transactions
that have not overdrawn an account, but it has done so and continues to do so.

**A.    Mechanics of a Debit Card Transaction**

66.    A debit card transaction occurs in two parts. First, authorization for the purchase
amount is instantaneously obtained by the merchant from Defendant. When a merchant physically

or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

67. At this step, if the transaction is approved, Defendant immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

68. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

69. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

70. Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, Defendant is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when

Defendant may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

71.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### B.     *Defendant's Account Contract*

72.     Plaintiff has a checking account with Defendant, which is governed by Defendant's standardized Account Documents.

73.     The Deposit Agreement promises that Zions immediately places holds on debit card transactions at the moment of authorization, and that those held funds are off limits for other, later transactions:

> **Authorization Hold.** When you conduct an Everyday Debit Card Transaction as a Signature-Based Transaction (defined below), the merchant requests that we authorize the transaction. When we authorize a transaction following the merchant's request, we typically note the amount of funds relating to that request by creating an "Authorization Hold" in your account. ***At the time we create the Authorization Hold, the Available Balance for your account is reduced by that amount*** (even though settlement will occur later and we will post the final transaction to your account). The amount of an Authorization Hold may be less than, the same as, or more than the final amount of the signature-based transaction.

> **Everyday Debit Card Transaction.** A one-time transaction or purchase in which the cardholder provides their debit card or debit card number to a merchant for payment of goods or services that are not recurring. ***Each payment is normally authorized (confirmed) by you (usually with a PIN or cardholder's signature) at the time of the transaction or purchase.*** We are authorized to rely on the

originating bank's or the merchant's coding of the transaction as an Everyday Debit
Card Transaction for all purposes, including refusing or paying the charge and
assessing the applicable fee if the account has an insufficient Available Balance..

Deposit Agreement, p. 11 (emphasis added).

74.     For APPSN Transactions, which are immediately deducted from a positive account
balance and should be held aside for payment of that same transaction, there are always funds to
cover those transactions—yet Zions assesses OD Fees on them anyway.

75.     The above promises mean that transactions are only overdraft transactions when
they are authorized into a negative account balance. Of course, that is not true for APPSN
Transactions.

76.     APPSN transactions are always initiated at a time when there are sufficient
available funds in the account.

77.     In fact, Zions actually authorizes transactions on positive funds, claims to set those
funds aside on hold, but then fails to use those same funds to settle those same transactions. Instead,
it uses a secret posting process described below.

78.     All the above representations and contractual promises are untrue. In fact, Zions
charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a
positive balance. No express language in any document states that Zions may impose OD Fees on
any APPSN Transactions.

79.     First, and most fundamentally, Zions charges OD Fees on debit card transactions
for which there are sufficient funds available to cover the transactions. That is despite contractual
representations that Zions will only charge OD Fees on transactions with insufficient available
funds to cover a given transaction.

80.     Zions assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

81.     Zions' practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Zions' actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

82.     Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

83.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Zions does when it re-debits the account during a secret batch posting process.

84.     In reality, Zions' actual practice is to deduct the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

85.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Zions cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

86.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Zions does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Zions releases the hold

placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

87.    This secret step allows Zions to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Zions specifically set aside money to pay them.

88.    This discrepancy between Zions' actual practices and the contract causes accountholders to incur more OD Fees than they should.

89.    In sum, there is a huge gap between Zions' practices as described in the Account Documents and Zions' practices in reality.

**C.    Defendant Abuses Contractual Discretion**

90.    Defendant's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous Account Documents. In addition, Defendant exploits contractual discretion to the detriment of accountholders when it uses these policies.

91.    Defendant uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

92.    Defendant uses this contractual discretion unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

**D.    Reasonable Accountholders Understand Debit Card/POS Transactions Are Debited Immediately**

93.    The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate deduction and holding of funds for debit card/POS transactions. That is because,

if funds are immediately debited from the balance and held, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited from the available balance, then they are necessarily available to be applied to the debit card transactions for which they are debited.

94.     Defendant was and is aware that this is precisely how accountholders reasonably understand such transactions to work.

95.     Defendant knows that many accountholders prefer debit cards for this very reason. Research indicates that accountholders prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

96.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited June 4, 2021).

97.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action,

http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited June 4, 2021).

98.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States increased by approximately 1.4 million in a recent five year period and, with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/morepeople-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

99.     Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

100.    Defendant was aware of accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

### E.    Plaintiff's Experience

101.    As an example, on December 24, 2019, among other instances, Plaintiff was assessed OD Fees for a debit card transaction that settled that day, despite the fact that positive funds were deducted immediately, prior to that day, for the transaction on which Plaintiff was assessed the OD Fee. At the time that the positive funds were deducted, Plaintiff had a positive balance, which would not have caused an OD Fee.

## CLASS ACTION ALLEGATIONS

102.   <u>Definition of the Class</u>:   Plaintiff brings this action on behalf of herself and on behalf of all others similarly situated. The Classes include:

(1) All persons who, within the applicable statute of limitations period, were charged multiple fees for the same transaction in a Zions checking account; and

(2) All persons with a Zions checking account in who, within the applicable statute of limitations, were charged a fee on an APPSN transaction.

The time period for each of the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Zions remedies the conduct complained of herein.

103.   Excluded from the Classes are Zions and its subsidiaries, affiliates, and any entities in which it has a controlling interest, and each of the officers, directors, immediate family members, legal representatives, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

104.   Plaintiff reserves the right to modify or amend the definition of the proposed Classes and/or to add a sub-class if necessary before this Court determines whether certification is appropriate.

105.   <u>Common Questions of Law and Fact Predominate</u>.  The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Classes. These questions predominate over questions that may affect only individual Class members because Zions has acted on grounds generally applicable to the Classes. Such common legal or factual questions include, but are not limited to:

a)      Whether Zions improperly charged multiple fees on a transaction;

    b)      Whether Zions improperly assessed OD Fees on APPSN transactions;

    c)      Whether any of the conduct enumerated above violates the parties' contract;

    d)      Whether any of the conduct enumerated above violates the covenant of good faith and fair dealing; and

    e)      The appropriate measure of damages.

106.   <u>Numerosity</u>:  The members of the proposed Classes are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Classes consist of thousands of members or more, the identities of whom are within the exclusive knowledge of and can be ascertained only by resort to Zions' records. Zions has the administrative capability through its computer systems and other records to identify all members of the Classes, and such specific information is not otherwise available to Plaintiff.

107.   <u>Superiority of Class Action and Risk of Inconsistent or Varying Adjudication</u>. Plaintiff and the members of the Class suffered, and will continue to suffer, harm as a result of Zions' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  It is impracticable to bring Class members' individual claims before the Court.  Individual joinder of all members of the Classes is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism,

including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.  Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of:  (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Zions as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

108. <u>Typicality</u>.  Plaintiff's claims are typical of the claims of the other members of the Classes in that they arise out of the same wrongful business practices by Zions, as described herein.

109. <u>Adequacy of Representation</u>.  Plaintiff is a more than an adequate representative of the Classes in that Plaintiff has a Zions checking account and has suffered damages as a result of Zions' contract violations, Zions' violations of the covenant of good faith and fair dealing. In addition:

a) Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b) There is no conflict of interest between Plaintiff and the unnamed members of the Classes;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal demands associated with this type of litigation.

110.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its treatment as a class action.

111.    Zions has acted or refused to act on grounds generally applicable to each of the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

112.    All conditions precedent to bringing this action have been satisfied and/or waived.

### FIRST CAUSE OF ACTION
(Breach of Contract, including Breach of the Covenant of Good Faith and Fair Dealing
on Behalf of Plaintiff and Classes)

113.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

114.    Plaintiff and Zions contracted for checking account services, as embodied in the Deposit Agreement and Fee Schedule.

115.    Defendant mischaracterized in the Account Documents its true NSF Fee and OD Fee practices and breached the express terms of the Account Documents.

116.    No contract provision authorizes Defendant to charge more than one fee on the same transaction. Likewise, no contract provision authorizes Defendant to charge an OD Fee on an APPSN transaction.

117.    A covenant of good faith and fair dealing is implied in contracts between financial institutions and their members as a matter of state law in nearly every state. Moreover, the UCC mandates good faith and fair dealing in all banking contracts. The covenant of good faith and fair dealing constrains Zions' discretion to exercise self-granted contractual powers.

118.    This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

119.    Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

120.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes her conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.\

121.    Defendant has breached its contracts with Plaintiff and the Classes through its NSF Fee and OD Fee policies and practices as alleged herein.

122.    Zions breached the covenant of good faith and fair dealing through its NSF Fee and OD Fee policies and practices as explained herein.

123.    Plaintiff and members of the putative Classes have performed all of their obligations pursuant to the Bank's agreements.

124.    Plaintiff and members of the putative Classes have sustained monetary damages as a result of each of Defendant's breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, demands a jury trial on all claims so triable and judgment as follows:

A.     Certifying the proposed Classes, appointing the Plaintiff as representative of the Classes, and appointing counsel for Plaintiff as counsel for the Classes;

B.     Declaring that Zions' policies and practices as described herein constitute a breach of contract and a breach of the covenant of good faith and fair dealing;

C.     Enjoining Zions from the wrongful conduct as described herein;

D.     Awarding restitution of all fees at issue paid to Zions by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.     Compelling disgorgement of the ill-gotten gains derived by Zions from its misconduct;

F.     Awarding actual and/or compensatory damages in an amount according to proof;

G.     Awarding pre-judgment interest at the maximum rate permitted by applicable law;

H.     Reimbursing all costs, expenses, and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees, costs, and expenses, pursuant to applicable law and any other basis; and

I.     Awarding such other relief as this Court deems just and proper.

DATED this 9th day of June, 2021.

MARSHALL OLSON & HULL, PC

BY:     /s/ Trevor C. Lang
        JASON R. HULL
        TREVOR C. LANG

KALIEL PLLC
JEFFREY KALIEL*
SOPHIA GOLD*

ATTORNEYS FOR PLAINTIFF AND
PROPOSED CLASS COUNSEL

*Pro Hac Vice Forthcoming

COMPLAINT [PROPOSED CLASS ACTION]